# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESTATE OF WILLIAM GANTT, by its Executor Linda Gantt, | |
| Plaintiff, | C.A. No. _____ |
| v. | |
| U.S. BANK, National Association; and FINANCIAL CREDIT INVESTMENT III TRUST B, | |
| Defendants. | |

## COMPLAINT

Plaintiff, Estate of William Gantt, by its Executor Linda Gantt (the "Estate"), through its undersigned counsel, hereby files and submits this Complaint against Defendant, U.S. Bank, National Association ("U.S. Bank"), and against Defendant, Financial Credit Investment III Trust B ("FCI"), and in support thereof, alleges and says:

## PARTIES

1. The Estate of William Gantt was established in South Carolina after the death of William Gantt, a resident of the State of South Carolina at the time of his death. The Executor of the Estate is Mr. Gantt's wife, Linda Gantt, a resident of South Carolina and a citizen of South Carolina. The Estate of William Gantt is a citizen of the State of South Carolina.

2. Upon information and belief, U.S. Bank is a national banking association with its principal office and headquarters in Cincinnati, Ohio. Upon information and belief, U.S. Bank is a citizen of the State of Ohio.

3. Upon information and belief, FCI is a Delaware statutory trust organized under the law of the State of Delaware and with its principal place of business at 1011 Centre Road, Suite 203, Wilmington, DE. Upon information and belief, FCI is a citizen of the State of Delaware.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Estate, a citizen of South Carolina, on the one hand, and U.S. Bank, a citizen of Ohio, and FCI, a citizen of Delaware, on the other, and because the amount in controversy exceeds $75,000.

5. This Court possesses specific personal jurisdiction with respect to U.S. Bank in this action pursuant to 10 *Del. C.* § 3104 because, among other things, U.S. Bank, acting on its own behalf or as agent for its principal, FCI, has had extensive personal contact with the forum that relates to the core subject-matter of this action, the Policy, which is a Delaware life insurance policy. Upon information and belief, these activities of U.S. Bank included communicating and working with its principal, FCI, in Delaware to maintain the Policy as a Delaware life insurance policy. Upon information and belief, these activities of U.S. Bank included U.S. Bank paying premiums on the Policy, which is a Delaware life insurance policy.

6. This Court possesses general personal jurisdiction with respect to FCI because it is Delaware statutory trust that is organized under the law of the State of Delaware and that maintains its principal place of business at 1011 Centre Road, Suite 203, Wilmington, DE. Upon information and belief, FCI is a citizen of the State of Delaware.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred within Delaware. In addition to the allegations above, this cause of action arose within the forum and relates to a life insurance policy that was issued to a Delaware statutory trust, maintained as a Delaware life insurance policy,

and for which the benefit was claimed by FCI, which is a Delaware statutory trust. Relevant witnesses and sources of information and documents relating to the issuance and delivery of the Policy are believed to be located within this forum. Additionally, upon information and belief, witnesses, documents and sources of information relating to U.S. Bank's and FCI's receipt, retention, and distribution of the Policy's death benefit proceeds are believed to be located within this forum.

## FACTS COMMON TO ALL CLAIMS

8. This action concerns a life insurance policy that is controlled by and subject to Delaware law, including because, upon information and belief, the policy was a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute, 18 *Del. C.* § 2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." *Id.* at § 2704(e)(4). The Delaware insurable interst staute further provides that a trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." *Id.* at § 2704(e)(4), (g). Notably, here, upon information and belief, the Policy was issued for delivery to the Gantt Trust (which is a Delaware trust), in Delaware, and was signed for by the trustee, Wilmington Trust, which has its principal place of business in Delaware.

9. As stated by the Supreme Court of Delaware, it is well recognized that, "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011). Insurance policies which are procured as a wager on the life of the person insured not only violate Delaware public policy and its constitutional prohibition

on wagering, but they also violate the state's insurable interest requirement, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id.*

10. Although human life speculators have been a problem for hundreds of years, never has this problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were effectively securitized and sold to other investors.

11. It is well established, however, that in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, . . . promoters sought to solve the supply side shortage by generating new, high value policies." *Id*. These policies are often referred to as STOLI—meaning stranger origination life insurance. *Id.*

12. One such STOLI promoter was family of interrelated Delaware entities known generally as Coventry.

13. Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

14. The STOLI transactions orchestrated by funders like Coventry and its agents were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions'

impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

15. The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the policies at issue were procured by third parties that lacked an insurable interest in the insureds and that sought to wager on the life of the insureds.

16. Not only do these STOLI policies violate public policy and constitutional bans on wagering and insurable interest laws, but they take advantage of insurers and their senior citizen insureds and otherwise convert a legitimate life insurance product into an illegitimate cash machine whereby a stranger to the insured is more interested in seeing the insured dead than alive.

17. In 2006, Coventry procured the life insurance policy (the "Policy") that is at issue in this action insuring the life of Mr. Gantt.

18. To induce Mr. Gantt to allow the Policy to be procured on his life, Coventry and those acting on its behalf may have represented that the Policy was being procured through a legitimate and legal transaction, or further induced Mr. Gantt with the promise of financial compensation if he permitted the Policy to be procured.

19. In reality, however, Coventry procured the Policy through an illegal STOLI scheme and Coventry lacked a valid insurable interest in the life of Mr. Gantt.

20. Upon information and belief, Coventry acted through its agent(s) to have an application for the Policy submitted to the insurance company that ultimately issued the Policy as a Delaware life insurance policy.

21. To facilitate these transactions, Coventry created the William Gantt Family Insurance Trust dated May 25, 2006 (the "Trust"), as a Delaware statutory trust, installed

Wilmington Trust Company ("Wilmington Trust") as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

22. Upon information and belief, Coventry further created a sub-trust (the "Sub-Trust") to the Trust. The Sub-Trust was also established as a mere cover to procure the Policy without a valid insurable interest.

23. Upon information and belief, the Policy insuring the life of Mr. Gantt was issued and delivered in Delaware to the Trust, as described above.

24. Upon information and belief, in connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

25. This purported "loan" was secured solely by a security interest in the Trust and Sub-Trust that held the Policy.

26. As a result of this purported "loan," neither Mr. Gantt nor anyone with an insurable interest in his life ever paid any premiums on the Policy. Rather, the loan was used to conceal the fact that such premiums were paid by Coventry for the purpose of creating a wager on Mr. Gantt's life.

27. Moreover, the purpose of the Policy was not to provide estate protection for Mr. Gantt, but rather he was used as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on his early demise.

28. Upon information and belief, in connection with the purported "loan" becoming due, stranger investors unrelated to Mr. Gantt took formal control of the Policy.

29. Upon information and belief, U.S. Bank acted as agent in connection with the Policy for Coventry and later FCI, both stranger investors with no insurable interest in Mr. Gantt's life.

30. As to FCI specifically, it is a sophisticated purchaser of life insurance policies procured on the lives of strangers that conducts due diligence in advance of its purchases and knew or should have known that the Policy was a Delaware policy procured by Coventry without insurable interest. *See* https://www.csx.ky/Attachments/9251/FCI%20III_31%20Dec%202020%20Final%20%20Signed_with_opinion.pdf.

31. On November 14, 2018, Mr. Gantt passed away.

32. Upon information and belief, without notifying the Estate or the family of Mr. Gantt, a claim for the Policy's death benefit was made by or on behalf of U.S. Bank or its principal, FCI, and the death benefit was then paid by the issuing insurance company to U.S. Bank and/or FCI.

33. Since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest. *Estate of Malkin v. Wells Fargo Bank*, 379 F. Supp. 3d 1263, 1272-73 (S.D. Fla. 2019) ("*Estate of Malkin*") (declaring Coventry policy void *ab initio* under Delaware law), aff'd on appeal that policy was void, 998 F.3d 1186, 1196-97 (11th Cir. 2021); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601, 609-10 (D. Del. 2019) ("*Sol*") (same); *U.S. Bank v. Sun Life*, 2016 WL 8116141, at *15 (E.D.N.Y. Aug. 30, 2016) (same), R.R. adopted, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) (same); *Sun Life v. U.S. Bank*, 2016 WL 161598, at *14 (S.D. Fla. Jan. 14, 2016) (same), aff'd on all issues except pre-judgment interest, 693 F. App'x 838 (11th Cir. 2017).

34. Thus, since at least 2016—before Mr. Gantt passed away and FCI and U.S. Bank sought and obtained the Policy's death benefit here—both of these defendants knew or should have known that the Policy lacked insurable interest. Yet, they sought and obtained the Policy's death benefit anyway.

35. Moreover, in *Sol*, U.S. Bank was the named defendant and FCI was the investor and beneficial owner of the illegal Coventry policy through U.S. Bank; FCI was, therefore, thus the actual defendant in interest. Thus, this Court has already ruled against both U.S. Bank and FCI with regard to Coventry policies and the decision in *Sol* has collateral estoppel and res judicata effect on both of these defendants in this action.

36. In June 2021, the Estate's counsel interviewed the producer of the Policy, Dennis Wohlgren, who confirmed facts establishing that the Policy was procured through the same Coventry scheme at issue in the cases cited above, and thus that the Policy lacked insurable interest. Specifically, Mr. Wohlgren stated that the Policy was funded by Coventry and that the purpose of the Policy was "to get free insurance for a couple of years and then try to sell or surrender the Policy." Mr. Wohlgren did not know what happened to the Policy or who owned it after the purported Coventry loan became due. Mr. Wohlgren did not know who owned the Policy at or around the time of Mr. Gantt's death.

37. On October 11, 2021, the Estate commenced action against U.S. Bank in the United States District Court of South Carolina, captioned as *Estate of William Gantt, by its Executor Linda Gantt v. U.S. Bank, National Association*, 6:21-cv-03293-TMC (the "South Carolina Action"). (ECF No. 1). At the time, the Estate did not know of FCI's involvement with the Policy.

38. The Complaint in the South Carolina Action (the "South Carolina Complaint") was served on U.S. Bank on October 28, 2021.

39. On November 16, 2021, the Delaware Supreme Court issued a unanimous, *en banc* decision in *Lavastone Capital LLC v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Berland*") which involved certified questions of law arising out a Coventry-procured life insurance policy. In *Berland*, the Court specifically addressed questions related to claims by an insured's estate under Section 2704(b) of Delaware's insurable interest statute, 18 *Del. C.* § 2704, and held, among other things, that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes in force;" "Section 2704(b) directs that if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient;" and "the General Assembly has prescribed that the estate should receive the proceeds of the policy as a matter of public policy" when, as here, a policy lacked insurable interest but the death benefit was nonetheless paid by the insurance company. *Id.* at *4.

40. In so holding, the Delaware Supreme Court in *Berland* reaffirmed its prior unanimous, *en banc* decision in *Price Dawe* which held, *inter alia*, that Delware has an immense public policy interest in preventing STOLI transactions from coming to fruition. Indeed, as *Price Dawe* held, STOLI policies violate Delaware's Constitution and are, therefore, void *ab initio* and a "fraud on the court" and can never be enforced, and thus assignments of STOLI policies are also void *ab initio* and ineffective as a matter of law. 28 A.3d at n.25, 1071.

41. On November 19, 2021, three days after the *Berland* decision was issued, U.S. Bank filed its Answer to South Carolina Complaint. (ECF No. 8).

42. On December 2, 2021, the Estate's counsel contacted U.S. Bank's counsel in an effort to schedule a Rule 26(f) conference in the South Carolina Action. U.S. Bank's counsel did not respond.

43. On December 13, 2021, the Estate's counsel again contacted U.S. Bank's counsel in an effort to schedule the Rule 26(f) conference in the South Carolina Action. U.S. Bank responded on December 16, 2021 and the Rule 26(f) conference was held on December 17, 2021.

44. The Estate served interrogatories on U.S. Bank in the South Carolina Action on January 7, 2022 seeking, among other things, to learn the identity of the undisclosed entity (which turned out to be FCI) on whose behalf U.S. Bank acted in connection with the Policy and who received some or all of the Policy's death benefit. U.S. Bank answered those interrogatories on February 7, 2022, identifying FCI as the entity on whose behalf it acted as securities intermediary in connection with the Policy and as an entity that received some or all of the Policy's death benefit proceeds.

45. As a result, February 7, 2022 was the first time that FCI's identity was known to the Estate. Prior to that date, the Estate lacked access to any information suggesting that FCI was the owner or beneficiary of the Policy, that FCI was a payee of the Policy's death benefit, or that FCI was in any way connected with the Policy.

46. On February 14, 2022, the Estate filed an amended complaint in the South Carolina Action (the "South Carolina FAC") to add FCI as a defendant alongside U.S. Bank.

47. Despite the clear application of Delaware law to the Policy and Delaware's immense public policy interest in applying its law to the Policy, FCI and U.S. Bank now argue in the South Carolina Action that the Policy is subject to South Carolina law and that the Estate lacks standing in South Carolina to bring a claim in connection with a human life wagering policy that was procured on Mr. Gantt's life in Delaware, through a Delaware-centered transaction, using a Delaware statutory trust, and was ultimately transferred to FCI, itself a Delaware statutory trust that knowingly or recklessly entered into and further engaged in an illegal wager on Mr. Gantt's

life, including by collecting (through U.S. Bank) the proceeds of the Policy and, on information and belief, holding such proceeds in Delaware.

48. The Estate now files this Delaware action to preserve its claims under Delaware law, including because, as a matter of public policy, Delaware has an immense interest in the application of its insurable interest law to policies, like the Policy, that were procured using Delaware statutory trusts, and the application of South Carolina law to the Policy would not only undermine Delaware public policy, but it would do nothing to serve the interest of any South Carolina resident in this dispute as there is no South Carolina resident who seeks protection or relief under that state's laws.

## COUNT I: RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST

49. The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

50. The Policy is controlled by and subject to Delaware law, including because the Policy was applied for and delivered to the trustee of the Trust in Delaware, and is thus a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute. 18 *Del. C*. § 2704(e)(4) (defining "trust owned policy"); *id*., § 2704(g) ("The existence of an insurable interest with respect to an employer-owned life insurance policy or trust-owned life insurance policy shall be governed by this section without regard to an insured's state of residency or location.")

51. The Delaware insurable interest statute provides, among other things, that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured." 18 *Del. C*. § 2704.

52. The Delaware Supreme Court has clarified that this insurable interest requirement is not satisfied where a third party without an insurable interest uses an insured as an instrumentality to procure a policy for itself as a wager on the insured's life. *Price Dawe* 28 A.3d at 1074.

53. Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee that received the benefits as a matter of common law and statute. 18 *Del. C.* § 2704 (b); *Berland*, 266 A.3d at 969-71; *Estate of Malkin*, 379 F. Supp. 3d at 1272, 1284.

54. Here, as confirmed by producer of the Policy, Dennis Wohlgren, the Policy was procured through the same Coventry scheme at issue in the cases cited above, and thus was procured without an insurable interest as a wager on Mr. Gantt's life.

55. Regardless of whether Mr. Gantt knew the details of this scheme or his identity was merely used as an instrumentality to procure the Policy, as set forth above, stranger investors were wagering on the life of Mr. Gantt and hoping to trigger a secondary market cash-in on the Policy's death benefit.

56. According to FCI's filings in the South Carolina Action, U.S. Bank acted as FCI's agent in perpetuating the human life wager on Mr. Gantt's life, and U.S. Bank and/or FCI ultimately collected the Policy's death benefit.

57. As a consequence, the Estate is entitled to recover those death benefit proceeds (plus applicable interest, attorneys' fees, and other costs and damages) from U.S. Bank and FCI, on a joint and several basis.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment against U.S. Bank and FCI, on a joint and several basis, as requested herein, together with costs in this action, and such other and further relief as this Court deems just and proper under the cirumstances.

    Respectfully submitted,

    **COZEN O'CONNOR**

    */s/ Kaan Ekiner*
    Kaan Ekiner, Esq. (#5607)
    1201 North Market Street, Suite 1001
    Wilmington, DE 19801
    (302) 295-2046
    kekiner@cozen.com
    *Attorneys for Plaintiff*

Dated: April 27, 2022